UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Claudia Fercello,

        Plaintiff,

v.                                                            Civil No. 06-4809 (JNE/SRN)
                                                              ORDER
County of Ramsey,

        Defendant.

---

Leslie L. Lienemann, Esq., and Celeste E. Culberth, Esq., Culberth & Lienemann, LLP, appeared for Plaintiff Claudia Fercello.

Karen A. Kugler, Esq., Ramsey County Attorney's Office, appeared for Defendant County of Ramsey.

---

Asserting that her former employer, Ramsey County, retaliated against her because she reported that she was sexually harassed, Claudia Fercello brings this action against the County under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a) (2006), and the Minnesota Human Rights Act, Minn. Stat. § 363A.15 (2008).  The case is before the Court on the County's Motion for Summary Judgment.  For the reasons set forth below, the Court grants the motion.

## I.  BACKGROUND

Since April 2003, Carol Roberts has served as the Director of the County's Community Corrections Department (Department).  The Department consists of several divisions, including the Administrative Services Division.  A deputy director heads each division.  In December 2004, Roberts hired Lee Palmer as the Deputy Director of the Administrative Services Division.

Before Fercello worked for the County, Roberts and Fercello knew each other.  In late 2004 or early 2005, Roberts informed Fercello of an employment opportunity with the

Department and stated that Palmer would contact Fercello about the position.  To avoid an appearance of favoritism and to make Palmer feel that the hiring decision was his to make, Roberts directed Fercello to deal directly with Palmer and to refrain from contacting Roberts about the hiring process.  Palmer decided to hire Fercello, and she began her employment as a Planning and Evaluation Analyst in the Administrative Services Division on March 15, 2005.

On Saturday, April 30, 2005, Fercello met Roberts at Roberts's house.  Fercello stated that Palmer had sexually harassed her, that the harassment started before he hired her, and that the harassment continued after her employment in the Administrative Services Division commenced.  Fercello also stated that she had talked with five people about the harassment before disclosing the harassment to Roberts.  Roberts was upset to learn that the harassment had occurred since before Fercello's hire and that Fercello had disclosed the harassment to five people before reporting it to Roberts.

On the morning of the following Monday, Roberts contacted the County's human resources department to request an immediate investigation into Fercello's allegations against Palmer.  That same morning, Roberts also met with Palmer.  Roberts prohibited Palmer from having any meetings with staff, restricted his activities to certain projects without staff involvement, prohibited him from making any decisions about administrative operations without clearing them with her, specifically directed Palmer not to communicate with Fercello, and stated that Fercello would report to her during the investigation.

Before Fercello reported Palmer's harassment, she had attended a couple of meetings of the senior management team.  After she made the report, Fercello no longer received invitations to the meetings.  Like Fercello, other personnel in the Administrative Services Division stopped receiving invitations to the meetings.

On Friday, June 17, 2005, Fercello learned that a report of the investigation had been completed.  The following Tuesday, Fercello sent an e-mail to Roberts in which Fercello asked for an update.  Roberts responded that she had reviewed the report over the weekend, that she had discussed the report with the human resources department, that Palmer would receive a copy of the report within a couple of days, that a meeting with Palmer would take place that week, and that another meeting with Palmer would take place the following week when Palmer would learn what action the County would take as a result of the investigation.

On July 5, 2005, Roberts informed Fercello that Palmer would resign and that he would be allowed to remain employed by the Department for up to six months.  In an e-mail sent to Roberts the next day, Fercello stated that she "was so stunned by what [she] was told" that she "didn't know what to say" when asked if she had any questions at the meeting.  Fercello stated that she had several questions and requested another meeting with Roberts.

In a meeting with Roberts on July 7, 2005, Fercello stated that she was not comfortable being around Palmer during the investigation and that she would not be comfortable being around him for six more months.  During the investigation, Fercello had attended meetings with Palmer and others present, and she occasionally passed him in the hall.  Roberts offered to find Fercello another office.  According to Fercello, Roberts also stated that Palmer would not want to run into Fercello because Fercello had ruined his career.  Fercello also claims that Roberts, having reviewed the report, said that she needed to teach Fercello how to work with men.[1]

In an e-mail sent to Roberts on Friday, July 15, 2005, Fercello stated that she was uncomfortable with decisions that were made as a result of the investigation.  Fercello reiterated

---

[1]      At her deposition, Roberts testified that the report made her uncomfortable because it disclosed a lot of details that Fercello had not told Roberts.  Asked what made her uncomfortable, Roberts mentioned that Fercello and Palmer went shopping together and had very intimate conversations with each other.

that she felt uncomfortable during the investigation and anticipated discomfort were Palmer to remain for six months.  She asserted that a move of her office was unacceptable.  She stated that decisions regarding Palmer were considerate of others and made at her expense.  She closed by asking Roberts to reconsider the decisions made regarding Palmer.

The following Monday, Roberts and Fercello met.  According to Fercello, Roberts stated that she was stunned by Fercello's July 15 e-mail and that she had to stop the process of finalizing Palmer's resignation because of the e-mail.  Fercello asked why Palmer was allowed to remain for six months.  Roberts replied that it was a compassionate decision and that she did not want to financially ruin Palmer.  Fercello reiterated that she did not feel comfortable with Palmer in the office.  She stated that she wished she had been asked how the decision to allow Palmer to remain for several months would impact her.  Fercello asked how her concerns about Palmer would affect her future at the County, and Roberts allegedly responded, "I can't believe that you would say that."  Fercello stated that Roberts appeared angry with Fercello since Fercello reported that Palmer was harassing her.  Roberts stated that she was not mad at Fercello and that Fercello had handled the situation correctly after finally bringing it to Roberts's attention.

One week later, Palmer sent a letter of resignation to the County in which he agreed to leave the County's employ by the end of 2005.  After Palmer tendered his resignation, Roberts named Sally Ruvelson as the acting Deputy Director of the Administrative Services Division. Fercello reported to Ruvelson.

In early August 2005, Roberts notified Fercello that Palmer's office would soon be moved and asked Fercello to report any concerns to her.  Palmer's last day of employment at the County was August 30.  After Palmer left, Ruvelson became the Deputy Director of the Administrative Services Division.

While employed in the Administrative Services Division, Fercello also volunteered with the County's specialty courts.  In August 2005, the acting Deputy Director of the Adult Division informed Roberts that Fercello had expressed opinions contrary to the Department's position while Fercello was volunteering with the DWI specialty court as an evaluator.  Roberts was also concerned about Fercello's involvement with case management decisions and field visits.  Roberts and Ruvelson spoke to Fercello about these concerns.  According to Fercello, Roberts told Fercello, "If you intend to stay here, you will have to be part of the team."

Roberts also spoke to the supervising judge about Fercello's involvement with the DWI specialty court.  The supervising judge denied that Fercello had taken positions contrary to those of the Department.  Roberts asked the supervising judge to preclude Fercello from speaking at staff meetings about issues other than program evaluation.  The supervising judge declined and later sent an explanation via e-mail to Roberts.  After receiving the e-mail, Roberts told the supervising judge to forget that she had ever called.  Fercello's participation in the DWI specialty court continued without alteration.

During her employment by the Administrative Services Division, Fercello initially parked in a lot behind the building, but she did not have a designated parking spot.  According to Fercello, Palmer stated that he would try to find a designated parking spot for her, but Fercello did not have such a spot before he left.  On August 29, 2005, Fercello encountered Palmer in the parking lot.  She asked Roberts for a spot close to a building entrance.  Roberts secured a visitor's parking spot close to the main entrance for Fercello's use for approximately three months.  Near the end of that period, Roberts asked Fercello whether anything had happened with regard to Palmer such that Fercello still needed the parking spot.  Fercello replied that nothing had happened, and Roberts stated that Fercello should give up the parking spot.  Fercello

used the spot through the end of 2005 and then resumed parking where she had previously parked.

In October 2005, Ruvelson solicited comments about Fercello's performance in anticipation of a performance evaluation. With a letter dated December 12, 2005, Ruvelson gave the evaluation to Fercello. In the letter, Ruvelson states that Fercello has "done good work in some areas, [but] in some other, very important, respects [her] performance does not measure up to what the Department needs and expects from a professional of [her] caliber." The evaluation covers approximately nine months of Fercello's probationary year, includes a summary rating of "Requires Improvement," and asserts that it will not be placed in Fercello's personnel file. Instead, the evaluation states that it is not a formal performance evaluation and that that it is intended "to inform and be used as the basis for discussion." Ratings and comments regarding ten subjects appear. The evaluation rated Fercello's job knowledge and public/client contacts as proficient; her productivity, acceptance of responsibility, co-worker contacts, communication, problem solving/decision making, work commitment, and planning/organizing as requiring improvement; and her quality of work as unsatisfactory. The comments included positive and negative remarks. In a 34-page letter dated January 6, 2006, and signed by her attorney, Fercello disputed many assertions made in the evaluation. Later that month, Fercello, her attorney, Ruvelson, and an assistant county attorney met. Fercello accused the County of retaliating against her because of her complaint about Palmer. The County retained an independent, outside investigator who concluded that Fercello's claim of retaliation was not substantiated.

When hired, Fercello was placed in a vacant office with a window. At that time, the Department was planning to move to another space. On December 12, 2005, Roberts notified Fercello that a Deputy Director for Community Relations and External Affairs would be hired

and would start the next month.  Roberts needed a director's office for the new employee, so Fercello had to move to another office.  The anticipated move of the Department had not yet occurred.  Roberts offered Fercello a choice of two spaces.  Fercello selected an office with a door and no window.  She moved to her new office in January 2006.

Fercello's probationary period ended on March 14, 2006.  Four days earlier, the County gave Fercello an option to continue working in her position for up to six months on the condition that she execute an irrevocable resignation effective no later than September 15, 2006.  If Fercello declined, her last day of employment would be March 14.  On March 13, Roberts reversed the decision to terminate Fercello's employment.  Instead, Roberts informed Fercello that Fercello had completed her probationary period.  Roberts also transferred Fercello's supervision from Ruvelson to Gale Burke.  Fercello complained to Burke about being stressed and overworked.

In June 2006, Ruvelson reviewed Fercello's performance from March 2005 to March 2006.  Ruvelson rated Fercello's overall performance as proficient.  Certain aspects of Fercello's performance required improvement.

In July 2006, Fercello filed a charge of discrimination with the Minnesota Department of Human Rights.  She claimed that the County had retaliated against her for reporting Palmer's sexual harassment of her.

Two months later, Burke, Fercello, and two others met to discuss a Purchase of Services report.  An argument between Burke and Fercello took place.  Fercello claimed that Burke was asking Fercello to lie to the County board, and Burke responded that she did not ask Fercello to lie.  Fercello left the meeting.  Burke drafted a reprimand based on Fercello's conduct at the meeting, but did not deliver it to Fercello.

In late October 2006, Fercello asked Roberts to clarify how certain statistics should appear in the Purchase of Services report.  Copying Burke and Ruvelson on her response, Roberts told Fercello how to report the statistics and encouraged Fercello to address time sensitive issues to Burke or, in Burke's absence, Ruvelson.  Because Burke had already answered Fercello's question, Ruvelson considered Fercello's inquiry insubordinate.  Burke sent an e-mail to Fercello stating that Fercello's inquiry directly contradicted Burke's decision and that Fercello's choice to inquire of Roberts without copying Burke and without disclosing Burke's decision was highly inappropriate.

Claiming that she was sick, Fercello took a day off in late November 2006.  That day, she interviewed for employment elsewhere.  In early December 2006, Fercello took a medical leave of absence.  Later that month, she submitted her resignation effective early January 2007.  While on leave, she sought employment elsewhere.  The Minnesota Department of Health offered Fercello a position in January 2007, and she began her employment there in February 2007.

## II.    DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant satisfies its burden, the party opposing the motion must respond by submitting evidentiary materials that "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In determining whether

summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The parties agree that Fercello's retaliation claims should be addressed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Fercello must first establish a prima facie case of retaliation. *See Macias Soto v. Core-Mark Int'l, Inc.*, 521 F.3d 837, 841 (8th Cir. 2008); *Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005). If Fercello presents a prima facie case of retaliation, then the burden shifts to the County to articulate a legitimate, non-retaliatory reason for the alleged adverse actions. *See Macias Soto*, 521 F.3d at 841; *Kasper*, 425 F.3d at 502. If the County satisfies its burden, then Fercello must demonstrate that the stated reason is a pretext for retaliation. *See Macias Soto*, 521 F.3d at 841; *Kasper*, 425 F.3d at 502.

To establish a prima facie case of retaliation, Fercello must show: (1) she engaged in protected conduct; (2) a reasonable employee would have found her employer's retaliatory action materially adverse; and (3) the materially adverse action was causally linked to her protected conduct. *See Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008), *cert. denied*, 129 S. Ct. 1003 (2009); *Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 785 (8th Cir. 2007). "A materially adverse action is one that would have 'dissuaded a reasonable worker from making or supporting a claim of discrimination.'" *Hervey*, 527 F.3d at 722 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Here, it is undisputed that Fercello engaged in protected conduct by reporting Palmer's sexual harassment of her to Roberts. The parties dispute whether Fercello can establish the second and third prongs of her prima facie case and whether she can demonstrate that the County's reasons for its actions are pretexts for retaliation.

*Treatment by Roberts and Ruvelson*

Fercello first argues that the manner in which Roberts and Ruvelson treated her constitutes a materially adverse action.  According to Fercello, Roberts and Ruvelson shunned, ignored, and interrupted Fercello, rolled their eyes when Fercello spoke, and treated Fercello coolly.  Fercello also claims that Roberts was angry with Fercello about the report of Palmer's sexual harassment, that Roberts displayed greater concern for Palmer's welfare than that of Fercello, and that Roberts questioned whether Fercello would remain employed by the County during their meeting about the concerns associated with Fercello's participation in the DWI specialty court.  These alleged actions do not constitute materially adverse actions.  *See Burlington N.*, 548 U.S. at 68; *Recio v. Creighton Univ.*, 521 F.3d 934, 940-41 (8th Cir. 2008); *Weger v. City of Ladue*, 500 F.3d 710, 727-28 (8th Cir. 2007); *Higgins v. Gonzales*, 481 F.3d 578, 591 (8th Cir. 2007) ("The record . . . shows [supervisor] was angry with [plaintiff] after [plaintiff] told others [supervisor] was a racist.  What is absent from the record is evidence showing [supervisor's] anger and related actions materially and adversely affected [plaintiff's] life such that a reasonable employee in her shoes would be dissuaded from complaining.").

*Vestiges of management*

Next, Fercello claims that Roberts and Ruvelson "remov[ed] from Fercello the vestiges of management—parking space, office, participation in management team meetings and removal from the management list."  With regard to parking, the record does not support Fercello's claim.  From the beginning of her employment to September 2005, she parked in an undesignated spot.  After encountering Palmer in late August 2005 in the parking lot, she asked for and received a designated parking spot close to an entrance.  After a few months had passed without incident,

she returned to parking where she had parked for the first six months of her employment.  The Court discerns no materially adverse action here.

As to her office, Fercello moved from an office with a window to an office without a window to make room for a newly hired deputy director.  The move of Fercello's office is not materially adverse.  *See Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 918 (8th Cir. 2007).  Moreover, Fercello has not shown a causal connection between her report of Palmer and her move.  Nor has she shown that the reason for her move, to make an office available for a newly-hired deputy director, is a pretext for retaliation.

Finally, Fercello attended a couple of meetings of the senior management team during her first months of employment in the Administrative Services Division.  After reporting Palmer, Fercello was not invited to the meetings.  Assuming without deciding that Fercello's removal from the team is a materially adverse action, *see Burlington N.*, 548 U.S. at 71 ("[R]eassignment of job duties is not automatically actionable.  Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." (internal quotation marks omitted)); *cf. Higgins*, 481 F.3d at 591 (holding that move did not constitute a materially adverse action where new duties were not more difficult, less desirable, or less prestigious), the Court concludes that Fercello has not demonstrated a causal connection between her report of Palmer and removal from the team.  The following exchange took place at Fercello's deposition:

> Q:      And you blame the fact that you reported Lee Palmer on the fact that you
>         were no longer invited to the senior management team meetings?
>
> A:      No.
>
> Q:      Have you ever said that?

A:      I probably—I remember saying that was one of the things that I noticed
         that was changed.

. . . .

Q:      Just so that I'm clear, you're not saying that the fact that you weren't
         invited to the senior management meetings is related to the retaliation
         claim or the report of Lee Palmer?

A:      What I'm saying is that was one of the changes that I noticed at the time.

Fercello's deposition testimony is illustrative of her reliance throughout this case on the logical

fallacy "post hoc, ergo propter hoc" (after this, therefore because of this). *See Shafer v. Kal Kan*

*Foods, Inc.*, 417 F.3d 663, 664 (7th Cir. 2005) ("*Post hoc ergo propter hoc* is not a good way to

establish causation."); *Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1179 (7th Cir. 1998)

("*Post hoc ergo propter hoc* is not enough to support a finding of retaliation . . . .").

    Even if a causal connection exists based on temporal proximity, *see Smith v. Allen Health*

*Systems, Inc.*, 302 F.3d 827, 832-33 (8th Cir. 2002)—Fercello testified that the first meeting to

which she was not invited took place "around the time that [she] reported Lee Palmer"—the

County states that it removed Fercello and others from the team as part of an effort to limit its

membership to high-level employees.  Fercello has not demonstrated that this reason is a pretext

for retaliation.

*2005 evaluation by Ruvelson*

    Fercello next identifies the performance evaluation given by Ruvelson in December 2005

as a materially adverse action.  Fercello claims that Ruvelson prepared the evaluation by seeking

negative reports in October 2005, but the record does not support Fercello's assertion.  Instead,

the record reveals that Ruvelson made a general request via e-mail for comments about

Fercello's performance.  Ruvelson's e-mail states:

         I will be conducting a mid-point of probation performance evaluation on
         Claudia Fercello in the next couple of weeks.  I would appreciate any comments

> or observations you may have about Claudia's work with you over the last few
> months.  The more specific you can be, tying comments to specific interactions or
> types of interactions, the more helpful.  I will include selected comments in my
> overall eval[uation], but will not identify the source without your permission.

The evaluation itself is not a materially adverse action.  Ruvelson stated that the evaluation

would not be placed in Fercello's personnel file, and Fercello has not identified any adverse

consequences flowing from the evaluation itself.  *See Littleton v. Pilot Travel Ctrs., LLC*, No.

08-1221, 2009 WL 1544436, at *2 (8th Cir. June 4, 2009); *Baloch v. Kempthorne*, 550 F.3d

1191, 1199 (D.C. Cir. 2008); *Gilbert*, 495 F.3d at 917 (stating that letter, which discussed

management goals and warned of disciplinary action if goals were not met, did not constitute a

materially adverse action); *Devin*, 491 F.3d at 785-86; *cf. Crawford v. Carroll*, 529 F.3d 961,

974 (11th Cir. 2008) (concluding unfavorable performance review that affected eligibility for

merit pay increase constituted a materially adverse action); *Halfacre v. Home Depot, U.S.A.,*

*Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007) (stating that "markedly lower performance-

evaluation scores that significantly impact an employee's wages or professional advancement"

are materially adverse).

*End of probation*

Fercello maintains that the decision to terminate her employment at the end of her

probation constitutes a materially adverse action.  The County contends that Fercello did not

experience a materially adverse action because Roberts reversed the decision to terminate

Fercello's employment and notified Fercello that she had completed her probation.  As noted

above, Fercello's probationary period ended on March 14, 2006.  On Friday, March 10, the

County notified Fercello that her employment would end on March 14 unless she executed an

irrevocable resignation effective no later than September 15, 2006.  The following Monday,

March 13, Roberts reversed the decision to terminate Fercello's employment and informed

Fercello that she had completed her probationary period.  Viewing the record in the light most favorable to Fercello, the Court concludes that the rescinded decision to terminate Fercello's employment did not constitute a materially adverse action.  *Cf. Burlington N.*, 548 U.S. at 71-73 (concluding that 37-day suspension without pay was materially adverse notwithstanding reinstatement with back pay); *Littleton*, 2009 WL 1544436, at *2-3 (discussing circumstances surrounding threat of termination); *Semsroth v. City of Wichita*, 555 F.3d 1182, 1185-86 & n.4 (10th Cir. 2009) (stating that distinction between unimplemented decision and an action is not affected by *Burlington Northern*); *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1120-21 (7th Cir. 2009) (concluding that a suspension that is not served is not a materially adverse action); *Baloch*, 550 F.3d at 1199 (stating that proposed 2-day and 30-day suspensions were not materially adverse); *Jackson v. United Parcel Serv., Inc.*, 548 F.3d 1137, 1142-43 (8th Cir. 2008) (postponed reinstatement to promoted position was not materially adverse where employer intended to reinstate employee but delayed reinstatement after learning of EEOC charge pending conclusion of internal grievance process); *Higgins*, 481 F.3d at 587 (stating that supervisor's recommendation to terminate employee was not an adverse employment action for purposes of discrimination claim where employee was not terminated); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 736-37 (6th Cir. 2006) ("In this case, as in *Burlington Northern*, the termination and concomitant loss of income constitutes a materially adverse action under Title VII, notwithstanding [plaintiff's] later reinstatement with back pay."); *Keeton v. Flying J, Inc.*, 429 F.3d 259, 263-64 (6th Cir. 2005) (concluding, for purposes of sexual harassment claim, that termination lasting only hours was not a tangible employment action).

*Performance appraisals*

Fercello contends that "there are repeated negative performance appraisals" in this case, "each of which is an adverse action."  The Court addressed above the December 2005 evaluation given by Ruvelson to Fercello.  Ruvelson gave Fercello a formal performance evaluation in June 2006.  That evaluation contained an overall rating of "proficient performance."  It rated Fercello's performance proficient in the following categories:  job knowledge, productivity, public/client contacts, co-worker contacts, communication, work commitment, and planning/organizing.  Fercello required improvement in quality of work, acceptance of responsibility, and problem solving/decision making.  Ruvelson's comments noted that Fercello's performance had improved considerably during the beginning of Fercello's second year.  Viewed in the light most favorable to Fercello, the record reveals that the June 2006 evaluation is not a materially adverse action.  *See Littleton*, 2009 WL 1544436, at *2; *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 929 (8th Cir. 2007).  Finally, Ruvelson and Burke started to prepare an evaluation of Fercello's performance near the end of 2006.  They did not complete the evaluation, the evaluation did not issue, and Fercello identifies no adverse consequences flowing from the evaluation.  Under these circumstances, the evaluation does not constitute a materially adverse action.  *See Littleton*, 2009 WL 1544436, at *2; *Baloch*, 550 F.3d at 1199 ("drafting of a proposed decision on a possible 30-day suspension was not materially adverse").

*Constructive discharge*

Fercello asserts the County retaliated against her by constructively discharging her.  "A constructive discharge occurs when an employee resigns after the employer has created an intolerable working environment in a deliberate attempt to compel such a resignation."  *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 928 (8th Cir. 2004); *see O'Brien v. Dep't of*

*Agric.*, 532 F.3d 805, 810-11 (8th Cir. 2008) (noting "substantial" burden of demonstrating that a reasonable person would find working conditions intolerable); *Fischer v. Andersen Corp.*, 483 F.3d 553, 556 (8th Cir. 2007) ("Constructive discharge is implicated only where an employer creates conditions so intolerable that a reasonable person would resign.").  Viewed in the light most favorable to Fercello, the record reveals that the environment in which Fercello worked falls far short of an intolerable working environment.  *See O'Brien*, 532 F.3d at 809-11 (holding allegations, distilled to verbal harassment and increased scrutiny, insufficient to establish constructive discharge); *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 870 (8th Cir. 2008) ("[A] reasonable person would not find the removal of two job functions, with no corresponding decline in pay or benefits, intolerable."); *Devin*, 491 F.3d at 790 ("[W]e have held feelings of being unfairly disciplined or criticized are insufficient to support a claim of constructive discharge."); *Fischer*, 483 F.3d at 557 ("Nor does a threat of discharge, in and of itself, create conditions so intolerable that a reasonable person would resign."); *Tatum v. Ark. Dep't of Health*, 411 F.3d 955, 960 (8th Cir. 2005) (working with unfriendly co-workers and in the same office as alleged harasser did not constitute constructive discharge); *Horn v. Univ. of Minn.*, 362 F.3d 1042, 1046-47 (8th Cir. 2004) (documentation of alleged performance problems and unprofessional treatment did not constitute intolerable working conditions).  Having failed to raise a genuine issue of material fact as to whether she was constructively discharged, Fercello cannot demonstrate that the County retaliated against her by constructively discharging her.  *See Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1146 (8th Cir. 2007).

### Causal connection and pretext

Fercello asserts that the same evidence that demonstrates a causal connection in her prima facie case also demonstrates that the County's reasons for its actions are pretexts for

retaliation.  The Court has addressed whether Fercello can demonstrate a causal connection and

pretext with regard to some of the alleged retaliatory actions above.  Here, the Court addresses

Fercello's contentions regarding causal connection and pretext in greater detail.  Fercello must

demonstrate that her protected conduct was a determinative factor in the alleged materially

adverse actions.  *See Hervey*, 527 F.3d at 722; *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144,

1148 (8th Cir. 2008).

Fercello relies heavily on *Heaton v. Weitz Co.*, 534 F.3d 882 (8th Cir. 2008).  In that case,

the plaintiff, Edward Heaton, claimed that the defendant, The Weitz Company, retaliated against

him in violation of Title VII, and a jury found in his favor.  534 F.3d at 885.  The district court

denied The Weitz Company's motion for judgment as a matter of law, and the Eighth Circuit

affirmed.  *Id.*  Fercello relies on the Eighth Circuit's conclusion in *Heaton* that there was

sufficient evidence for the jury to find a causal connection between Heaton's discrimination

complaint and his layoff:

> Weitz argues six months passed between the time of Heaton's discrimination
> complaint and the time Heaton was laid off.  But all was not well during this six
> month period.  Only a few weeks after Huber [the subject of Heaton's
> discrimination complaint] was let go, a turf dispute arose between Heaton and
> Henecke, who used to work with Huber.  The district court noted such disputes
> were "common in the industry."  Even though such disputes were common, Novy
> (an admitted friend of Huber and his family) informed Heaton he was being
> terminated, and handed Heaton his last two paychecks.  Heaton asked if he was
> being fired because of his discrimination complaint, and Novy promptly revoked
> the termination.  Novy then demanded Heaton apologize to Henecke, even though
> Henecke was the one who called Heaton a "spic" during the dispute. Later, when
> Heaton was laid off, Novy told Heaton, "Things are catching up to you."
>
> Finally, Weitz had a history of allowing superintendent ironworkers, like
> Heaton, to maintain their titles during slow periods, while performing labor
> instead of supervision, in order to avoid layoffs. This option was not offered to
> Heaton.  A reasonable jury could find, as the district court articulated, "there was
> a pattern of adverse actions against [Heaton] beginning shortly after the time he
> complained . . . and lasting until the time he was laid off."

*Id.* at 888.

The Court is not persuaded by Fercello's reliance on the *Heaton* case. Fercello compares her rescinded termination to that of Heaton. Heaton's rescinded termination took place a few weeks after his discrimination complaint, the decision to terminate him arose out of a dispute that was common in the industry and that rarely resulted in termination, and the termination was rescinded in response to Heaton's question whether he was being fired because of his complaint. *Id.* at 885-86. Fercello's rescinded termination took place almost eleven months after her report of Palmer; the decision to terminate her took place at the end of her probationary year after individuals other than Ruvelson and Roberts, including the Deputy Director of the Juvenile Division and the acting Deputy Director of the Adult Division, had recommended that Fercello not pass probation; and the decision to rescind Fercello's termination took place independent of any action by her.

Fercello also states that she, like Heaton, experienced a number of adverse actions beginning immediately upon her report of harassment and escalating through the end of her employment. In *Heaton*, the pattern of adverse actions that followed Heaton's complaint took place over the course of six months. *Id.* at 888. Fercello complains about sporadic actions that took place over the course of the nineteen months between her report of Palmer and her resignation, a period during which her supervisor changed multiple times and her performance was criticized by individuals who did not know of her report of Palmer. *Cf. Smith*, 302 F.3d at 832 ("A pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence necessary to satisfy the causation requirement.").

In addition to relying on *Heaton*, Fercello points to several events that allegedly demonstrate a causal connection. First, Fercello claims that Roberts was unhappy with Fercello because of Fercello's report of harassment, but the record reveals that Roberts was upset because

Fercello had not reported Palmer's harassment sooner and because Fercello had disclosed the harassment to others before reporting it to Roberts.  In her declaration, Fercello states:  "After I informed Roberts of the sexual harassment, Roberts quizzed me about why I didn't come forward earlier.  Roberts acted upset because I didn't tell her immediately. . . .  Roberts was even more upset that I discussed the harassment with [a state judge]."  At her deposition, Roberts admitted the same:  "I was pretty upset because I learned that this had been going on since before [Fercello] was hired.  That she hadn't come to me, but that she had gone to five other people, including [her counsel] and a judge, and so I was upset about that."

Fercello also claims that Roberts was "unhappy about Palmer leaving the County." Although Roberts showed concern for Palmer by allowing him to remain at the County for up to six months because she did not want to ruin him financially and allegedly made some intemperate remarks during her discussions with Fercello about the results of the investigation, this evidence does not give rise to an inference that Roberts was unhappy about Palmer leaving the County.[2]  *Cf. Van Horn*, 526 F.3d at 1149 ("As we have already said, Ms. Van Horn did offer evidence that supported an inference that Mr. Clark told Mr. Mayberry about her report to Ms. Bush, which may reflect some sympathy for Mr. Mayberry's position, but we do not think that such sympathy can support an inference that her report was a determinative factor in Mr. Clark's decision to discharge her.").

Next, Fercello states in her memorandum, "At the first sign that anyone had anything negative to say about Fercello, Roberts repeatedly cautioned Fercello that, if she intended to

---

[2]      Fercello was obviously displeased with the decision to allow Palmer to remain at the County for up to six months, but she had no right to dictate the County's response to Palmer's harassment.  *See Brenneman*, 507 F.3d at 1146; *Weger*, 500 F.3d at 723; *cf. Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1125 (8th Cir. 2007) ("[T]he law does not require an employer to fire a sexual harasser in the first instance to demonstrate an adequate remedial response."); *Barrett v. Omaha Nat'l Bank*, 726 F.2d 424, 427 (8th Cir. 1984).

continue her employment, she should be a team player."  This assertion refers to Roberts's discussion with Fercello after Roberts heard that Fercello was stating opinions contrary to the Department's position while volunteering with the DWI specialty court.  Under these circumstances, Roberts's admonition does not give rise to an inference of a causal connection or pretext.  *See Hervey*, 527 F.3d at 724 ("reiterat[ing] that 'antidiscrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace'" (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999))).

Fercello claims that Ruvelson had discussions with the County's Diversity Director about how to manage Fercello because of Fercello's complaints of retaliation.  Fercello cites e-mails written by Ruvelson in late September 2005 to support this assertion.  The e-mails indicate that Ruvelson was seeking resources to improve her working relationship with Fercello.  They do not give rise to an inference of a causal connection or pretext.

Fercello also claims that Ruvelson sought negative criticism of Fercello's performance in October 2005.  As noted above, the record reveals that Ruvelson made a general request for comments about Fercello.  This request does not give rise to an inference of a causal connection or pretext.

Fercello claims that the pretextual nature of Ruvelson's negative performance evaluations gives rise to a finding of causation.  Fercello argues at length about the accuracy of Ruvelson's comments, but Fercello has not raised a real issue as to the genuineness of Ruvelson's perceptions.  Accordingly, the evaluations do not give rise to an inference of a causal connection or pretext.  *See Hervey*, 527 F.3d at 725; *Edmund v. MidAmerican Energy Co.*, 299 F.3d 679, 685-86 (8th Cir. 2002).

Finally, Fercello asserts that the "pretextual nature of the County's criticism is further demonstrated by County witnesses' contentions that Fercello left ten to twenty unfinished contracts" when she resigned.  According to Lynn McClung, who took over Fercello's duties after Fercello's resignation, there were "approximately" ten incomplete contracts that had to be finished by year's end.  Harry McPeak, an assistant county attorney, testified that "a huge number of contracts . . . needed a great deal of work before the end of the year."  Asked what he meant by a huge number, McPeak responded, "Could be 10 to 20."  Fercello testified that she did not "remember precisely" the status of the contracts for 2007 when she resigned and that "[t]here were probably a couple of contracts that [she] had in process that needed to be finished up."  The witnesses' varying recollections as to the number of contracts left incomplete does not give rise to an inference of a causal connection or pretext.  *See Hervey*, 527 F.3d at 725; *Edmund*, 299 F.3d at 685-86.

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.      The County's Motion for Summary Judgment [Docket No. 18] is GRANTED.

2.      This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  June 5, 2009

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge